

# MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| **KATHERINE VALLEY,** | ) | |
| | ) | **WD82744** |
| **Appellant,** | ) | |
| v. | ) | **OPINION FILED:** |
| | ) | |
| **DIVISION OF EMPLOYMENT** | ) | **July 30, 2019** |
| **SECURITY,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**Appeal from the Labor and Industrial Relations Commission**

**Before Division Two:**
**Lisa White Hardwick, P.J., Thomas H. Newton, and Mark D. Pfeiffer, JJ.**

Ms. Katherine Valley challenges a divided ruling of the Labor and Industrial Relations Commission reversing the Appeals Tribunal's award of unemployment compensation benefits following her termination from employment for alleged misconduct by the Society of St. Vincent De Paul St. Louis Diocesan Council (employer). She contends that competent and substantial evidence does not support the Commission's ruling. We reverse.

Ms. Valley began working for the employer in March 2017 as a cost accountant, earning approximately $56,500 annually. She worked as a liaison between store managers and the employer's office and had been provided a handbook setting forth the employer's policies and rules. In January 2018, Ms. Valley received a 5% raise. The following month, Ms. Debra Downey, Ms. Valley's supervisor, issued Ms. Valley

a corrective action form warning that she had not treated co-workers with respect and had created a conflict with co-workers. This warning was based on her reference to the Human Resources director in January 2018 as a "black cloud," which had been overheard in Ms. Valley's conversation with a co-worker.[1] During the appeal hearing before a referee, Ms. Downey testified that this reference violated the non-harassment policy, but this part of the action form shared with Ms. Valley was not checked as a violation. According to Ms. Downey, the conduct constituted bullying as well as harassment on the basis of a protected classification, i.e., that an authority figure was similarly situated to those protected under classifications such as race, color, national origin, disability, religion, marital status, pregnancy, veteran status, sexual orientation, or age.[2]

The employer conducted Ms. Valley's mid-year review in March 2018, in which a few areas were marked as needing improvement.[3] Still, the employer indicated on

---

[1] The record reflects the supervisor's recognition of tension between Ms. Valley and the HR director. Ms. Valley wrote a response to the February 2018 corrective action report, stating that she had made a mistake and had apologized to the HR director.

[2] In this regard, Ms. Downey testified, "I think also being in a position of authority can make you a target class, essentially."

[3] The areas flagged for improvement were the following:

> Positive Attitude: Shares ideas and suggestions. Presents a professional clean appearance. Promotes SVDP to donors, employees and volunteers for advancement of our organization. Sets a positive example.

> Teamwork: Work collaboratively with others in friendship to achieve together.

> Leadership: Inspiring others to achieve overall SVDP mission with the face of Christ in each other.

> Communication: Embracing everyone person to person, sharing information effectively internally and externally.

No areas had been marked for improvement during an evaluation that occurred in November 2017.

the review form that "store managers and assistant managers frequently rely upon [Ms. Valley] to assist with trouble-shooting and problem solving, and she makes a point to be available to them throughout their work day, even after regular office hours." Ms. Valley was cautioned about being "resistant to taking on tasks outside of her role," and informed that colleagues sometime avoided "approaching her to help with projects . . . because they anticipate being met with negativity." Ms. Downey testified that this statement about Ms. Valley's negativity related to her gossipy behavior. Nothing in this evaluation documents Ms. Downey's testimony that Ms. Valley was disruptive in the workplace or gossipy or that she had been subject to frequent complaints and coaching.[4] Ms. Valley testified that the conversation during her mid-year review had focused on how she was overwhelmed because she had been required to take on the work of other employees, and Ms. Downey indicated that Ms. Valley's resistance to helping with other's projects and tasks was discussed during the review. Ms. Valley also testified that this telephone hearing was the first she had heard that multiple people had complained about her on multiple occasions or that she was repeatedly coached about getting into others' personal business. The written record does not contradict Ms. Valley's testimony, and Ms. Downey acknowledged that she did not document every complaint and coaching session, stating "that's not really a good use of my time."

In June 2018, the employer issued another corrective action form based on an incident involving a new employee whom Ms. Valley allegedly warned about

---

[4] Ms. Downey testified, when asked to show where in the employer's exhibits anything had been documented about Ms. Valley's "gossipy" behavior and multiple coaching sessions, pointed to the mid-year review itself and said "this is a coaching session" and "all of this is a coaching session." Ms. Downey also stated, "[H]ere is the Semi-Annual Review which documents all those things. That's my answer to that."

3

unspecified negative action by the HR director that could occur after her first month. This action form noted a harassment policy violation and again checked boxes for not treating co-workers with respect and creating conflict with co-workers. In the form's narrative, Ms. Downey stated, "The conversation is in direct violation of Section 1-5 of the Employee Handbook, and creates a hostile work environment by creating an intentional office division, and by the discomfort that it caused for the receptionist in her office position."[5] As to this corrective action, Ms. Downey testified that the new employee "felt as though she was being targeted" and it was "an incredibly, um, kind of a—aggressive conversation that had been had." She also testified that this was her own "spin" on the incident.[6] Ms. Downey linked the June 2018 incident to the January 2018 incident involving the HR director and reiterated that the non-harassment policy,

---

[5] Section 1-5 of the Employee Handbook is the employer's non-harassment policy. In addition to addressing how harassment complaints will be handled, the policy states the following:

> It is the Society's policy to prohibit intentional and unintentional harassment of any individual by another person on the basis of any protected classification including, but not limited to, race, color, national origin, disability, religion, marital status, pregnancy, veteran status, sexual orientation or age. The purpose of this policy is not to regulate our employees' personal morality, but to ensure that in the workplace no one harasses another individual.

[6] When questioned about the lack of anything in the form indicating that Ms. Valley's statements were "aggressive," Ms. Downey testified,

> Um, it does not because I'm kinda going now, you, I'm kinda going on my memory on the—in hindsight and kinda looking at it from that approach; the—the write-up talks about it had made her quote, unquote, uncomfortable; that was exactly the—the words that she had written when she had filed, um, this complaint, and, um, it—no, it's okay; and that she was alarmed, so that was—I guess that's probably the better language to use is that the, um—the employee felt as though, um she was—is abrasive; that it made her completely uncomfortable; she was incredibly alarmed and taken aback by this— by this relate—by this conversation. I'm kinda putting my own interpretation into the rest of that.

She responded to a question about none of this appearing in the form shared with Ms. Valley by testifying, "I—I just clarified with you that that is my perspective as I'm looking back on hindsight, so we can move off of that now."

4

that is, Section 1-5 of the handbook, applied to this director. She did not indicate whether or in what protected class the receptionist could be included.

The incident giving rise to Ms. Valley's termination in August 2018 involved her query to the marketing director about the employer's policy regarding terminated employees not receiving a vacation payout. The corrective action form checked the violation boxes pertaining to treating co-workers with respect and creating conflict with co-workers. According to Ms. Downey, Ms. Valley's query was motivated by concerns she had when she learned in a text message from a terminated employee that he had not received a vacation payout. Ms. Valley did not mention him by name to the marketing director nor did anyone other than Ms. Downey testify that Ms. Valley had discussed this former employee's circumstances with other co-workers. Ms. Downey testified that she believed Ms. Valley was behind workplace "buzz" about the former employee because Ms. Valley had communicated with the marketing director about the policy when "there was a rumor going around the office that this former employee did not get his vacation payout; it was not fair." Ms. Downey admitted that no one had come to her to state that Ms. Valley discussed the circumstances of the employee's termination with them nor did this appear in the email from Ms. Valley to the marketing director.[7] The narrative on the form called Ms. Valley's query "a follow-up to an in-person conversation about what the Leadership Team discusses in its meetings and

[7] According to Ms. Downey, when Ms. Valley was summoned to discuss the email, the rumors, and the August 2018 corrective action form, the two had an extended discussion about why Ms. Valley had sought information about the vacation buyout policy from a director; this discussion between supervisor and employee included a specific reference to the terminated employee by name as Ms. Valley sought to explain her concerns and the motivation behind her query to the marketing director once she had learned that the employer's policies do not provide for a vacation payout to a terminated employee. This is the only evidence the employer produced that Ms. Valley had said something in the workplace specifically raising the terminated employee's name.

5

whether or not they were aware of policies enforced by another director [i.e., the HR director] that were inconsistent with our mission." Ms. Downey characterized the behavior as Ms. Valley trying to "stir the pot" and to "create a hostile work environment between various co-workers." She further wrote, "Finally, and most concerning, is that you appear to have inserted yourself into the details of another employee's termination." Ms. Valley testified that she was not a member of the Leadership Team, had never had a conversation about it, and was unaware of any policy that prevented her from asking a director about a workplace policy. Ms. Downey testified that she did not know whether Ms. Valley had released any confidential information to the marketing director when asking about the vacation payout policy. Nevertheless, Ms. Downey maintained that Ms. Valley violated a confidentiality policy that applied to "organization finances, pricing, products and new product development, software and computer programs, marketing strategies, supplies, customers and potential customers, and knowledge, skills and abilities of personnel." Ms. Downey testified that discussing a terminated employee's circumstances fit within the catch-all "not limited to" phrase accompanying this list. Ms. Downey also indicated that questions about a workplace policy such as a vacation payout should have been directed to the HR director.

Ms. Valley applied for unemployment compensation benefits, and a Division of Employment Security deputy denied them, finding that she had been terminated for misconduct. According to the deputy's determination, "[t]he claimant was discharged because she was discussing the details of a former employee's discharge with co-workers. This is a violation of the employer's confidentiality policy." Ms. Valley filed an appeal, and a telephone hearing was conducted by an Appeals Tribunal referee in

6

November and December 2018. Stating that the employer's testimony was not credible "because the employer did not present any testimony from a witness with first-hand knowledge of the events," and that the employer did not meet its burden of proving misconduct, the Appeals Tribunal reversed the deputy's determination and awarded Ms. Valley unemployment compensation.

The employer appealed to the Commission, which reversed in a 2-1 decision. The Commission determined that the employer had met its burden, citing subsections 288.030.1(23) (a) & (e), which address that particular misconduct involving a knowing disregard of an employer's interests, knowing violation of expected standards, and violations of known employer rules. The Commission concluded as follows:

> Employer established misconduct in this matter. Employer specifically warned claimant about the expectations and policies to treat coworkers with respect and not to start conflict in the workplace. However, claimant continued to violate employer's policies and act in knowing disregard of employer's interests and expected standards.

Ms. Valley timely filed this appeal in the Eastern District, and it was transferred here because she does not reside in Missouri. § 288.210.[8]

**Legal Analysis**

In the first point, Ms. Valley claims that the Commission erred in finding that she had committed misconduct in connection with work as defined under the Missouri Employment Security Law, § 288.030.1(23)(e), because "the competent and substantial evidence demonstrated only that [Ms.] Valley had inquired about the application of the

---

[8] Statutory references are to RSMo (2016), unless otherwise indicated.

7

vacation pay-out policy and [t]he [employer] has no rule that prohibited [Ms.] Valley from making this inquiry."[9]

Our review of a Commission decision is delimited under section 288.210, which provides that its findings "as to the facts, if supported by competent and substantial evidence and in the absence of fraud, shall be conclusive." Still, "[t]he Commission may not arbitrarily ignore relevant evidence not shown to be disbelieved or noncredible." *Geiler v. Mo. Labor & Indus. Relations Comm'n*, 924 S.W.2d 606, 609 (Mo. App. E.D. 1996). We may set the decision aside on specified grounds including "[t]hat there was no sufficient competent evidence in the record to warrant the making of the award." § 288.210(4). "When an administrative agency makes factual determinations that affect private rights . . . the Missouri Constitution guarantees greater judicial scrutiny" than we accord to a sufficiency review following a bench or jury trial. *Seck v. Dep't of Transp.*, 434 S.W.3d 74, 79 (Mo. banc 2014).

> Article V, section 18, guarantees the right of judicial review and requires that agency findings be supported by competent and substantial evidence upon the whole record. As a result, a court reviewing factual findings by an administrative agency must consider all of the evidence that was before the agency and all of the reasonable inferences that may be drawn from that evidence, including the evidence and inferences that the agency rejected in making its findings.
>
> Even though the constitution requires courts to give greater scrutiny to administrative fact findings than it does to facts found by a jury or judge, it does not authorize a reviewing court to substitute its judgment for that of [the] administrative agency being reviewed. Section 288.210 reinforces this point, . . .

---

[9] Section 288.030.1(23)(e) defines "misconduct" as "conduct or failure to act in a manner that is connected with work . . . which shall include:"

> (e) A violation of an employer's rule, unless the employee can demonstrate that:
>    a. He or she did not know, and could not reasonably know, of the rule's requirements;
>    b. The rule is not lawful; or
>    c. The rule is not fairly or consistently enforced; . . .

8

*Id.* at 79 (citations omitted); *see also Miller v. Help At Home, Inc.*, 186 S.W.3d 801, 805 (Mo. App. W.D. 2006) ("A factual determination by the Commission will be disturbed on appeal, on the basis that it is against the weight of the evidence, only when there is a firm belief that the judgment is wrong."). While we defer to the Commission as to witness credibility and the weight given to testimony, we do "not view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the award." *Fendler v. Hudson Servs.*, 370 S.W.3d 585, 588 (Mo. banc 2012) (citations omitted). We review questions of law *de novo*, and "whether the Commission's findings support the conclusion that a claimant engaged in misconduct connected with his or her work is a question of law." *Id.* at 588-89 (citations omitted).

"[W]hen the employer claims that the applicant was discharged for misconduct, the burden shifts to the employer to prove misconduct connected to work . . . by a preponderance of the evidence." *Id.* at 589 (citations omitted). We distinguish between conduct that justifies termination and misconduct that precludes benefits because "[m]isconduct, in this context, is to be construed least favorably to a forfeiture of benefits." *Scott v. Div. of Emp't Sec.*, 377 S.W.3d 603, 606 (Mo. App. W.D. 2012) (citation omitted); *see also Walker v. Div. of Emp't Sec.*, 333 S.W.3d 517, 520 (Mo. App. W.D. 2011) ("[A]pplying the relevant statutory provisions, we are mindful that the purpose of Missouri's unemployment compensation act is to provide benefits to persons who are unemployed through no fault of their own." (citation omitted)). Further, "the employer must establish that the employee's actions were not simply the result of poor workmanship, lack of judgment, or an inability to do the job." *Walker,* 333 S.W.3d at 520 (citation omitted).

9

The Commission based its conclusion on a number of facts that it found credible, but our review of the record does not find competent and substantial evidence to support many of these findings, which are set forth below.

- Employer discharged claimant on August 28, 2018, because claimant repeatedly treated her coworkers with disrespect and created conflict in the workplace in violation of employer's policies.

The employer's witness struggled to point to specific workplace policies purportedly violated by Ms. Valley's conduct and repeatedly asserted that the behavior was included in the "not limited to" parts of the rules in the employee handbook addressing harassment on the basis of protected status, and general standards of conduct. The Commission's use of the term "repeatedly," if intended to indicate conduct beyond the incidents subject to formal corrective action, is not supported by evidence other than Ms. Downey's telephone hearing testimony, which focused on unspecified gossipy and disruptive behavior that Ms. Downey did not personally observe or document.

- Employer gave claimant written warnings, or corrective actions, on February 7, 2018[,] and June 27, 2018[,] for treating coworkers with disrespect, such as referring to the human resources director as a "black cloud," and creating conflict in the workplace by telling a new employee that the human resources director would "turn on her" after her first month.

To the extent that the Commission's use of "such as" could connote that these were just two of many incidents, we note that these were the *only* incidents before August 2018 subject to formal corrective action and thus documented in the record. Any implication that other purported misconduct occurred is unsupported by any evidence other than Ms. Downey's testimony, which was inconsistent, contradicted by the written record, and, for the most part, non-specific as to time, place, or individuals allegedly involved.

- On August 27, 2018, claimant learned from a recently discharged store manager that he did not receive any vacation pay upon discharge.

While the record supports this finding, to the extent that Ms. Downey testified, and the deputy found, that this information violated the employer's confidentiality policy, we would observe that Ms. Valley learned about the termination not through her employment, but rather directly from the employee after he was terminated. The Commission did not refer to the confidentiality policy, perhaps recognizing that nothing in the final corrective action form leading to Ms. Valley's termination addressed or involved the employer's confidentiality policy.

- Claimant started asking store managers if they knew about employer's policy and practice of not paying vacation pay with discharges.

While the record supports this finding, no employer rule has been cited to suggest that employees are not permitted to discuss workplace policies with co-workers.

- As a result of claimant's questioning, a rumor went around the office that the discharged store manager did not receive his vacation pay.

The Commission's cause-and-effect assertion is purely speculative and is not based on any evidence in the record. That the discharged employee had texted Ms. Valley about the circumstances of his termination raises a fair inference that this employee also communicated with others who were equally likely to have initiated workplace discussions about the terminated employee's circumstances.

- Claimant also tried to talk to the marketing director to ask why the discharged store manager did not receive his vacation pay.

No evidence supports the Commission's conclusion that Ms. Valley sought to discuss the employer's termination policy for any reason other than that she was concerned, after she learned that such a policy existed, whether it was compatible with the

11

organization's mission. Ms. Downey testified that the marketing director did not know why Ms. Valley had asked her about the employer's policy of not paying out vacation when an employee is terminated. She also testified that Ms. Valley discussed with her how this policy fit within the employer's values and framework.

- Claimant did not go to human resources to discuss this issue privately.

This fact is supported by the evidence, but any implication that Ms. Valley instead publicly discussed the circumstances of the discharged employee's termination is not, as discussed above, supported by the record. As well, on this record, it is clear that Ms. Valley would not have gone to the HR director to discuss the termination policy because they did not have a positive relationship. Nor was there any rule of which Ms. Valley was aware, or that Ms. Downey could refer to, mandating this procedure for this type of inquiry.

- We find credible employer's witness's testimony that claimant was trying to meddle in affairs that did not pertain to her.[1]

    [1] Claimant admitted to employer that she asked the marketing director about the discharged store manager and the fact that he did not get his vacation pay. Therefore, employer's evidence did not consist solely of hearsay. [Commission's footnote]

This statement is not supported by any evidence. Ms. Valley never spoke with the marketing director about the discharged manager; rather, according to Ms. Downey, she sought to discuss with the marketing director a workplace policy that Ms. Valley believed did not reflect the employer's mission of compassion. The statement about hearsay appears to respond to the dissenting commissioner who opined that the "[e]mployer's evidence of misconduct consisted solely of hearsay. Employer chose not

12

to present witnesses who actually heard claimant's comments and questions, such as the human resources director, the marketing director, or the new employee."[10]

It was clear during the appeal hearing that Ms. Downey could point to no specific policy in the employee handbook that addressed treating coworkers with respect and not starting conflict in the workplace, which was the basis of the Commission's ruling.[11] Section five covers general workplace conduct and does not include either of these matters. So Ms. Downey claimed that the conduct rule was an evolving concept and included matters such as bullying despite not mentioning or listing it. Ms. Downey also testified at length about what she referred to as gossipy behavior and many employee complaints about Ms. Valley getting into their business. According to Ms. Downey, one of those complaints included the terminated employee who was at the center of Ms. Valley's termination; this employee purportedly complained in January 2018 about Ms. Valley asking him about his marital status. If this were accurate, one has to ask why this employee would have texted Ms. Valley a few months later to discuss the circumstances of his termination. Yet, no corroborating evidence was

---

[10] Because Ms. Valley has not raised hearsay as an issue, we do not address it, although we acknowledge that unobjected-to hearsay can be considered competent and substantial evidence in an unemployment compensation proceeding. *Mark Twain Homes, Inc. v. Labor & Indus. Relations Comm'n*, 616 S.W.2d 145, 147 (Mo. App. E.D. 1981); *see also Snider v. Mo. Highways & Transp. Comm'n*, 356 S.W.3d 323, 324 (Mo. App. W.D. 2011). The dissenting commissioner opined that Ms. Valley's contrary testimony constituted an objection to the hearsay evidence Ms. Downey presented, but Ms. Valley was represented by counsel during the telephone hearing, and such an implied objection appears to be recognized by our courts only in cases where the claimant appears *pro se*. *See, e.g., Helfrich v. Labor & Indus. Relations Comm'n*, 756 S.W.2d 663, 666 (Mo. App. E.D. 1988) (finding no waiver of objection to hearsay evidence when *pro se* claimant testified that non-testifying witness was lying if he told the employer something that differed from what he told the claimant).

[11] Ms. Downey made a passing reference to Ms. Valley's violation of the "Society principle of Vincentian Spirituality and Friendship," which is mentioned in the February 2018 corrective action form, but spent most of her time, when testifying about this incident, trying to shoehorn it into the employer's non-harassment policy. Accordingly, it strikes us as somewhat disingenuous for the Commission to rely on "not treating co-workers with respect" and "creating conflict with co-workers" as the basis for Ms. Valley's purported misconduct and termination.

13

introduced that showed Ms. Valley had been disciplined for engaging in such behavior or that anything more than two corrective action forms, not involving "gossipy" behavior, were in her personnel file before August 2018.

Ms. Downey also shifted the focus of Ms. Valley's purported January violation during the hearing to the non-harassment policy and linked Ms. Valley's behavior to harassment on the basis of a protected classification—that is, an authority figure's protected status. In light of the questionable legal basis for including an "authority figure" among those more traditionally recognized protected classifications, it would have been prudent for the employer to put this in writing in the workplace policy, if it were a concern. Without a specific reference, we find it unlikely that Ms. Valley would have reasonably known that the non-harassment policy included authority figures. § 288.030(23)(e)a. And even where the employer warns an employee about conduct that will not be acceptable going forward, as occurred here, the final incident, while characterized as not treating co-workers with respect and starting conflict with co-workers, did not actually involve either category. Ms. Valley asked the marketing director whether terminated employees should receive a vacation payout. There is no policy forbidding an employee from asking a director about a workplace policy. Nor is there any evidence in the record, other than Ms. Downey's testimony, that Ms. Valley had spoken with store managers about the discharged employee and the circumstances

of his termination, specifically his failure to receive a vacation payout.[12]  Ms. Downey also conceded that the marketing director had no idea why Ms. Valley would ask her about the vacation payout, because the terminated store manager's circumstances were not part of the query.  In this regard, Ms. Downey testified as follows:

> Q.     Okay.  Are you saying that [Ms. Valley] was discussing with—are you saying that the director told you that [Ms. Valley] was discussing the compensation that the terminated employee had received?
>
> A.     The director didn't know why she was asking this question.
>
> Q.     Okay, but that's not my question.  My question is was it reported to you that the director said [Ms. Valley] is telling me what the compensation arrangement was for the terminated employee?
>
> A.     No, the director did not know why [Ms. Valley] was asking this.
>
> Q.     Okay.  So all you knew was [Ms. Valley] was asking a question about what is our policy about paying vacation pay when employees are terminated?
>
> A.     That was what I knew that she had asked the Marketing Director.

When asked about information she had to show that Ms. Valley had been talking in the workplace about the circumstances of the store manager's termination, Ms. Downey

---

[12] Note also that the written description of the violation leading to Ms. Valley's termination does not include any discussion about anyone other than the director with whom Ms. Valley had communicated regarding the employer's policy on vacation payouts.  That description is as follows:

> At the time noted above, [Ms. Valley] sent an email message to a Director as a follow-up to an in-person conversation about what the Leadership Team discusses in its meetings and whether or not they were aware of policies enforced by another director that were inconsistent with our mission.  The discussion was instigated following the termination of another employee.
>
> The nature of this discussion concerns us, especially after previous warnings that [Ms. Valley] was trying to "stir the pot" and create a hostile work environment between various co-workers.  If there was a question about a policy, it should have been directed to HR.  If there was a concern about a director's behavior, it should have been addressed with your supervisor.  Finally, and most concerning, is that you appear to have inserted yourself into the details of another employee's termination.

stated, "I had had many people coming to me and telling me; I'm hearing around the office and I think that we're hearing—and we—we don't know where this is coming from, all right. . . ." Ms. Downey further stated that other people in the office were not coming to her to say that Ms. Valley was discussing with them the circumstances of the employee's termination: "I wouldn't put it coming to me; I would say there was rumors going around the office; we were hearing a lot of buzz." On further questioning about whether Ms. Valley had ever received a written policy stating that she could not talk to a director about HR policies, Ms. Downey indicated that Ms. Valley should have spoken with the HR director about HR policies, but admitted that no policy required this action. Without providing any evidence, Ms. Downey stated that this was a matter of office procedure.

On this record, we agree with Ms. Valley that evidence of misconduct—seeking to engage the marketing director in a conversation about the employer's termination policy—under section 288.030.1(23)(e) was not competent and substantial. No rule of which Ms. Valley would have been aware appears to be implicated, and no evidence showed that Ms. Valley discussed a terminated employee's circumstances with the marketing director. Even if Ms. Valley's questions about the termination policy did violate some rule or can somehow be construed to constitute conduct about which she had previously been warned—not treating co-workers with respect or creating conflict with co-workers—we do not believe that her discussion of or questions concerning this policy constituted a violation of a workplace rule or that it rises to the level of conduct that justifies the forfeiture of benefits. At most, Ms. Valley's conduct reflected poor judgment in not fully appreciating that a question about the employer's HR policy

16

would be misinterpreted as a personal challenge to the HR director and hence not treating co-workers with respect and starting conflict in the workplace. In light of the variable, shifting, and undocumented bases on which the employer sought to prove misconduct connected to the workplace involving violation of a workplace rule about which the employee knew, the employer failed to meet its burden. This point is granted.

The second point relied on addresses whether competent and substantial evidence supported the Commission's ruling under section 288.030.1(23)(a), which defines misconduct as "conduct or a failure to act demonstrating knowing disregard of an employer's interest or a knowing violation of the standards which the employer expects of his or her employees." According to Ms. Valley, the employer "failed to produce competent and substantial evidence that discussions about the vacation pay-out policy or it[s] application would violate the standards that universally apply in the work force or would in any way subvert the interests of [the employer]." We apply the same standard of review that we applied to the previous point.

Standards expected of employees are those "basic standards of behavior that apply universally in the work force." *Seck*, 434 S.W.3d at 84.[13] The employer cites cases from Minnesota to support its claim that it met its burden of showing that Ms. Valley was discharged for misconduct connected to work in light of fact situations in those cases involving rumor-spreading, gossipy, and confrontational behavior. As we discussed at length above, however, no evidence of such behavior was documented in the record, nor did competent and substantial evidence show that such behavior

---

[13] This case construed a prior version of section 288.030, which separated the "employer's interest" from the "standards of behavior which the employer has the right to expect of his or her employee," but involved a similar willfulness component.

17

precipitated Ms. Valley's termination. The employer failed to show that asking the marketing director about the employer's policy regarding vacation payout on termination constituted a knowing disregard of the employer's interest or a knowing violation of the standards which the employer expects of its employees. A concern about employee welfare would not appear to run counter to the employer's Christian mission. And, even if questioning a workplace policy somehow constitutes a disregard of the employer's interest, the employer did not demonstrate that this disregard was knowing. Accordingly, the employer failed to carry its burden. This point is granted.

## Conclusion

On this record, the employer did not meet its burden of proving either that Ms. Valley had violated a workplace rule or had knowingly disregarded the employer's interest or violated expected standards by asking the marketing director about the employer's vacation payout policy. Accordingly, we reverse and remand for the calculation and award of unemployment compensation benefits to Ms. Valley.

/s/ *Thomas H. Newton*

Thomas H. Newton, Judge

Lisa White Hardwick, P.J., and Mark D. Pfeiffer, J. concur.

18